Michael W. Young, USB #12282
Adam Bondy, USB #14423
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  801.532.1234
Facsimile:  801.536.6111
MYoung@parsonsbehle.com
ABondy@parsonsbehle.com
ecf@parsonsbehle.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| JANE DOE 1, JANE DOE 2, JANE DOE 3, JANE DOE 4, JANE DOE 5, and JANE DOE 6,<br><br>Plaintiffs,<br><br>vs.<br><br>Davis School District,<br><br>Defendant. | **COMPLAINT AND JURY DEMAND**<br><br>Case No. CaseNumber<br><br>Judge<br><br>**Magistrate Judge** MagistrateJudgeName<br><br>(JURY TRIAL DEMANDED) |

## SUMMARY

1.    Soulivanh Phongsavath a/k/a Soulyvanh Phongsavath a/k/a "**Souli**" was a soccer coach at Davis High School ("**DHS**") and oversaw the boys and girls soccer teams until at least 2023.

2.    Due to his position, he had access and exposure to underage female students on a daily basis.

3.    Souli engaged in several grooming or pre-grooming behaviors, including:

a.      Targeting victims: selecting girls who sought to improve their soccer skills and who looked to him for guidance, authority, and reassurance.

b.      Gaining trust and information: collecting personal details from the girls including encouraging them to confide in him as to their private thoughts, romantic interests, and dating activities.

c.      Filling a need: making the girls dependent on him for advice, soccer coaching, and educational/scholarship opportunities.

d.      Normalizing sexually oriented conversation: discussing with the girls who they had crushes on, who they'd kissed, what they did when making out.

e.      Isolation: creating opportunities to be alone with the girls away from family or other adults, including in his girls' soccer class.

4.      School officials within Davis School District ("**the District**") received multiple complaints from Plaintiffs' parents, among others, about Souli's concerning and inappropriate interactions with their children, who were underage children at DHS.

5.      Despite this, the District refused to properly investigate Souli and instead allowed him to have continued access to underage students, including Plaintiffs.

6.      When the District finally agreed to listen to Plaintiffs and investigate their complaints, it failed to protect their identities from Souli, his assistants, and his supporters.

7.      Plaintiffs suffered retaliation at the hands of Souli, his assistants, his supporters, and others, including the Principal and Vice Principal of DHS.

8.      Some Plaintiffs initially had their "on-field" time increased, apparently in the belief that this would appease them.

2

9.    When they continued to complain about Souli's behaviors, Plaintiffs had their "on-field" time reduced or eliminated, were cut from the soccer teams without explanation, and/or were assaulted by fellow soccer team members and their supporters for "snitching" or "telling on" Souli.

10.    The District's negligent employment, retention, and supervision of Souli enabled him to access, manipulate, and groom multiple underage students.

11.    The District engaged in institutional betrayal of Plaintiffs and violated its obligations under Title IX by allowing Souli to, inter alia, institute a class during school hours for the purpose of spending time with the girls' soccer team players, organize non-soccer related activities for the girls' soccer teams outside of school bounds, and encourage sexualized behavior by underage female students.

12.    The District further betrayed Plaintiffs and violated Title IX by failing to properly investigate complaints regarding Souli and by failing to properly protect Plaintiffs' identities.

13.    The District is also liable under multiple theories pursuant to 42 U.S.C. § 1983.

14.    Accordingly, Plaintiffs JANE DOE 1, JANE DOE 2, JANE DOE 3, JANE DOE 4, JANE DOE 5, and JANE DOE 6 by and through undersigned counsel, complain of Defendant Davis School District as follows:

## **PARTIES, JURISDICTION, AND VENUE**

15.    Plaintiffs' full names and identities are not disclosed in this Complaint to protect their privacy as victims of predatory sexual behavior. Their full identities will be made known to all parties subject to a confidentiality agreement.

3

16.    Plaintiff JANE DOE 1 was at all relevant times a student within Davis School District and a resident of Davis County.

17.    Plaintiff JANE DOE 2 was at all relevant times a student within Davis School District and a resident of Davis County.

18.    Plaintiff JANE DOE 3 was at all relevant times a student within Davis School District and a resident of Davis County.

19.    Plaintiff JANE DOE 4 was at all relevant times a student within Davis School District and a resident of Davis County.

20.    Plaintiff JANE DOE 5 was at all relevant times a student within Davis School District and a resident of Davis County.

21.    Plaintiff JANE DOE 6 was at all relevant times a student within Davis School District and a resident of Davis County.

22.    Defendant Davis School District is located in Farmington, Davis County, Utah.

23.    The District employed, contracted with, and was otherwise responsible for adequately training, supervising, and investigating claims against Souli during his tenure, pursuant to its duties to students and its obligations under Title IX.

24.    Due to the District's failures, it is also liable under § 1983.

25.    Venue is proper in this Court in accordance with 28 U.S.C. § 1391(b)(1) and (2) because Defendant is resident in Davis County, Utah, and because a substantial part of the events or omissions giving rise to the claims herein occurred in Davis County, Utah.

## GENERAL ALLEGATIONS

### 1.    Traumatic effect of sexual grooming

26.    Ensuring secrecy and complicity when sexually abusing children is a vital component of the offense pathway for adult sex offenders. Secrecy of, and compliance with, the offender are essential aspects of the grooming process.

27.    The purpose of grooming is designed to not only assure the offense goes undetected and the victim does not detract or disclose, but also to establish access and trust.[1]

28.    Grooming, in the context of child sexual abuse, refers to the systemic physical and psychological desensitization of a child through engagement in a behavior or set of behaviors used to develop trust, gain access to, build rapport, create opportunity, establish compliance, and ensure secrecy of a target victim.[2]

29.    Given that grooming is a "process" engaged in over a period of time that works toward desensitizing and normalizing increasingly venturous and severe boundary (physical and psychological) violations, it is difficult for those being groomed to recognize the escalation and identify it as unhealthy.

30.    Similarly, for victims who once thrived on the affirming strategies, a shift in the process (i.e. withholding of gifts or attention, more vulgar sexual "jokes", "accidental" touch or exposure, past consumption of drugs or alcohol now used against them) may result in a sense of

---

[1] Bennett, N., & O'Donohue, W. (2014). The construct of grooming in child sexual abuse: Conceptual and measurement issues. *Journal of Child Sexual Abuse*, 23, 957–76. doi: 10.1080/10538712.2014.960632.

[2] Bennett & O'Donohue, 2014; McAlinden, N. M. (2006). 'Setting 'em up': Personal, familial and institutional grooming in the sexual abuse of children. *Social & Legal Studies, 15*(3), 339–62, doi: 10.1177/0964663906066613; Whittle, H., Hamilton-Giachritsis, C., Beech, A., & Collings, G. (2013). A review of online grooming: Characteristics and concerns. *Aggression and Violent Behavior*, 18, 62-70.

4883-3999-6888.v7

shame or guilt which may lead them to question their own integrity, moral character, or responsibility in the offense.[3]

31.    Grooming is accomplished through the creation of an erroneous identity and the fabrication of a sense of friendship, responsibility, care, and trustworthiness in interpersonal relationships and role assignments (i.e. teacher, coach, neighbor helping with carpooling).[4]

32.    In turn, the sexual offender works toward developing a positive reputation that, if challenged by an accusation of abuse, stands up to scrutiny.

33.    If the sexual offender is in a position of power in an institution, this reputation, along with the power differential the sexual offender has over the victim and established reputation makes disclosure (and belief of disclosure) improbable.[5]

34.    Grooming of victims cloaks the sex offender's behaviors in ambiguity. This façade abets a victim to doubt their perception and experiences and for systems to be passively permissive.[6]

35.    The grooming by the sex offender functions in such a way that it capitalizes on societal suspicion of victims claiming sexual abuse, especially when the accusation is against a relative or trusted community member.[7]

---

[3] Bennet & O'Donnohue, 2014; McAlinden, 2006.
[4] McAlinden, 2006.
[5] McAlinden, 2006.
[6] Herman, J. (1997). *Trauma and recovery: The aftermath of violence from domestic abuse to political terror*. New York: Basic Books.
[7] Ketring, S. A., & Feinauer, L. L. (1999). Perpetrator-victim relationship: Long-term effects of sexual abuse for men and women. *The American Journal of Family Therapy, 27*, 109-120; Stokes, L. D., McCord, D., & Aydlett, L. (2013). Family environment, personality and psychological symptoms in adults sexually abused as children. *Journal of Child Sexual Abuse, 22*, 658-676. doi: 10.1080/10538712.2013.811142.

4883-3999-6888.v7

36.    Embedded within these systems of disbelief and suspicion, a victim's own experience of grooming makes it more likely that they will blame themselves for the offense and thus be fearful of personal consequences, see the offender as the "victim" and want to protect him or her, experience shame and embarrassment, and believe the offender that no one will be there to believe and protect them.[8]

37.    This complex dynamic speaks to prior research findings that grooming, especially contentious grooming behaviors (use of threats or force), have as much of a negative impact on survivor outcomes than the type of offense itself.[9]

38.    Sexual grooming has a direct effect on the severity of trauma symptoms in adult survivors of child sexual abuse, and can in and of itself contribute to anxiety, depression, sexual abuse trauma, sleep problems, and dissociation.[10]

**2.    Statistics on sexual violence**

39.    Women are at a far greater risk of becoming victims of sexual violence than men. The following statistics compiled by the National Sexual Violence Resource Center paint an alarming picture for the United States:

40.    One in five women will be raped at some point in their lives.  Comparatively, only one in seventy-one men will be raped.[11]

---

[8] Feiring, C., Taska, L., & Chen, K. (2002). Trying to understand why horrible things happen: Attribution, shame, and symptom development following sexual abuse. *Child Maltreatment, 7*(1), 25-39.

[9] Bennett, S.E., Hughes, H. & Luke, D.A. (2000). Heterogeneity in patterns of child sexual abuse, family functioning, and long-term adjustment. *Journal of Interpersonal Violence,* 15(2): 134-157.

[10] Wolf, M., Pruitt, D.K., (2019). Grooming Hurts Too: The Effects of Types of Perpetrator Grooming on Trauma Symptoms in Adult Survivors of Child Sexual Abuse. *Journal of Child Sexual Abuse,* 28(3), 345-359.

41.    Fifty-one percent of female victims of rape are raped by an intimate partner and forty-one percent of victims report being raped by an acquaintance.[12]

42.    Ninety-one percent of rape victims are women.[13]

43.    Compounding the problem, victims of sexual assault are at significantly higher risk of being assaulted again than those who have never been assaulted. Apart from domestic violence, sexual assault has the highest revictimization rate of any crime.[14]

44.    Additionally, 1 in 9 girls, compared to 1 in 53 boys, under the age of 18 experience sexual abuse or assault at the hands of an adult.[15]

45.    82% of all victims of sexual abuse under the age of 18 are female.[16]

46.    Females ages 16-19 are 4 times more likely than the general population to be victims of rape, attempted rape, or sexual assault.[17]

---

[11] Black, M. C., Basile, K. C., Breiding, M. J., Smith, S .G., Walters, M. L., Merrick, M. T., Stevens, M. R., *The National Intimate Partner and Sexual Violence Survey (NISVS): 2010 summary report*, (2011). Retrieved from the Centers for Disease Control and Prevention, National Center for Injury Prevention and Control: http://www.cdc.gov/Violence Prevention/pdf/ NISVS_Report2010-a.pdf.

[12] *Id.*

[13] Rennison, C. M., *Rape and sexual assault: Reporting to police and medical attention*, 1992-2000 [NCJ 194530], (2002). Retrieved from the U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics: https://www.bjs.gov/content/pub/pdf/rsarp00.pdf.

[14] Davis, R., Guthrie, P., Ross, T., O'Sullivan, C., *Reducing Sexual Revictimization: A Field Test with an Urban Sample* (2006). Retrieved from the National Criminal Justice Reference Service: https://www.ncjrs.gov/pdffiles1/nij/grants/216002.pdf.

[15] Finkelhor, D., Shattuck, A., Turner, H. &. Hamby, S. *The Lifetime Prevalence of Child Sexual Abuse and Sexual Assault Assessed in Late Adolescence*, 55 Journal of Adolescent Health 329, 329-333 (2014)

[16] Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Sexual Assault of Young Children as Reported to Law Enforcement (2000).

[17] Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Sex Offenses and Offenders (1997).

47.     Victims of school employee sexual misconduct span most demographic characteristics, though students who are low income, female, and in high school are most likely to experience sexual misconduct by a school employee.[18]

48.     Contrary to common conception, school employee sexual misconduct offenders are typically popular and they often have been recognized for excellence. Offenders include all types of school employees, such as teachers, school psychologists, coaches, principals, and superintendents.[19]

49.     School employee offenders are most frequently male.[20]

50.     Ironically, the same characteristics of teacher-student relationships that help create a successful educational environment can also create a potentially exploitative situation. Research has shown that school employees whose jobs include individual, isolated, or alone time with students (such as music teachers, coaches, and counselors) are more likely to engage in sexual misconduct.[21]

---

[18] Fazel, S., Sjostedt, G., Grann, M., & Langstrom, N. (2010). Sexual offending in women and psychiatric disorder: A national case-control study. Archives of Sexual Behavior, 39(1), 161–167.

[19] Shakeshaft, C. (2004). Educator sexual misconduct: A synthesis of existing literature. US Department of Education, Policy and Programs Studies Service. Retrieved from https://www2.ed.gov/rschstat/research/pubs/misconductreview/report.pdf

[20] Moulden, H. M., Firestone, P., Kingston, D. A., & Wexler, A. F. (2010). A description of sexual offending committed by Canadian teachers. Journal of Child Sexual Abuse, 19, 403–418.

[21] Gallagher, B. (2000). The extent and nature of known cases of institutional child sexual abuse. British Journal of Social Work, 30, 795–817; Willmsen, C., & O'Hagan, M. (2003, December 14–16). Coaches who prey. The Seattle Times. Retrieved from http://old.seattletimes.com/news/local/coaches/news/dayone.html

51.    Close contact with students, who are often eager to please their teachers, allows offenders to groom students for eventual sexual misconduct, by giving special attention and rewards while slowly increasing the amount of touching or other sexual behaviors.[22]

52.    The harm presented by grooming, in and of itself, coupled with female student's increased likelihood of being sexually exploited obligates schools like DHS to employ policies, procedures, training and supervision regimes, and other practices responsive to these risks.

**3.    Title IX requirements**

53.    An institution may be liable for civil penalties if it has not upheld its legal obligations under Title IX.

54.    An institution like Davis School District may be liable for violating Title IX where the institution (a) acts with deliberate indifference to known acts of harassment discrimination, and/or assault; (b) through official policy creates a heightened risk of harassment, discrimination, and/or sexual assault; (c) retaliates against an individual who reports or complains or harassment, discrimination, and/or assault; (d) treats women and men disproportionately; and/or (e) enforces policies that result in unequal impact on men and women.

55.    "Deliberate indifference to known acts of harassment . . . amounts to an intentional violation of Title IX, capable of supporting a private damages action."[23]

56.    This includes harassment both by the school itself and by other students, as long as "the funding recipient has some control over the alleged harassment."[24]

---

[22] Salter, A. (2003). Predators, pedophiles, rapists, and other sex offenders. New York, NY: Basic Books; Shoop, R. J. (2004). Sexual exploitation in schools: How to spot it and stop it. Thousand Oaks, CA: Corwin Press.

[23] *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643 (1999) (citing *Gebser v. Lago Vista Independent Sch. Dist.*, 524 U.S. 274 (1998).

57.    The Tenth Circuit has interpreted Supreme Court precedent to create a four-factor test for liability for deliberate indifference. A plaintiff "must allege that the [institution] (1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school."[25]

58.    Deliberate indifference may be demonstrated by a school's "respond[ing] to known . . . harassment in a manner that is clearly unreasonable."[26]

59.    Whether a response is "clearly unreasonable" is a question of fact and is intended to be flexible.[27]

60.    Nevertheless, where a school "knowingly refuse[s] to take any action in response to the behavior, such as investigating or putting an end to the harassment, or refuse[s] to take action to bring the recipient institution into compliance," the school has demonstrated deliberate indifference giving rise to liability.[28]

61.    A school "intentionally subject[s] students to harassment" when it "deliberately decide[s] not to take remedial action."[29]

62.    Severity can also be established by a single incident. "The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile

---

[24] *Id.* at 644.
[25] *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1246 (10th Cir. 1999) (citing *Davis*).
[26] *Davis,* 526 U.S. at 649.
[27] *Id.*
[28] *Papelino v. Albany College of Pharmacy of Union Univ.*, 633 F.3d 81, 90 (2d Cir. 2011) (internal punctuation omitted) (quoting *Davis*, 526 U.S. at 651, 654; *Gebser*, 524 U.S. at 290).
[29] *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007) (emphasis in original) (citing *Davis*, 524 U.S. at 290).

environment, particularly if the harassment is physical. Indeed, a single or isolated incident of sexual harassment may create a hostile environment if the incident is sufficiently severe."[30]

### 4.    Section 1983 Liability Requirements

63.    To prove a § 1983 claim, a plaintiff must show (1) a violation of rights secured by the Constitution or laws of the United States; and (2) the alleged deprivation was committed by a person acting under color of law.[31]

64.    "It is incontrovertible that bodily integrity is necessarily violated when a state actor sexually abuses a schoolchild and that such misconduct deprives the child of rights vouchsafed by the Fourteenth Amendment."[32]

65.    "The right to be free from sexual abuse at the hands of a public-school teacher is clearly protected by the Due Process Clause of the Fourteenth Amendment."[33]

66.    "Students have a liberty interest in their personal safety and bodily integrity which is protected by the Due Process clause of the Fourteenth Amendment . . . . [t]hose rights are violated by sexual assault or abuse by a school employee."[34]

67.    "The traditional definition of acting under color of state law requires that the [person] ha[s] exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"[35]

---

[30] 2011 Dear Colleague Letter at 3 (citing *Jennings v. Univ. of N.C.*, 444 F.3d 255, 268, 274 n.12 (4th Cir. 2006); *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 259 n.4 (6th Cir. 2000); *Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999); *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 692 (7th Cir. 2010); *Turner v. Saloon, Ltd.,* 595 F.3d 679, 686 (7th Cir. 2010); *McKinnis v. Crescent Guardian, Inc.*, 189 F. App'x 307, 310 (5th Cir. 2006)).
[31] *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988).
[32] *Doe v. Taylor Independent School Dist.*, 15 F.3d 443, 451-52 (5th Cir. 1994).
[33] *Stoneking v. Bradford Area School Dist.*, 882 F.2d 720, 727 (3d Cir. 1989) ("[a] teacher's sexual molestation of student is an intrusion of the schoolchild's bodily integrity[.]")
[34] *Doe v. Beaumont*, 8 F.Supp.2d 596, 605 (E.D. Tex. 1998)

68.    A public-school teacher is generally found to be a state actor.[36]

69.    Municipalities can be liable under § 1983 when a plaintiff demonstrates (1) that an employee committed an underlying constitutional violation, (2) that a municipal policy or custom exists; and (3) that there is a direct causal link between the policy or custom and the injury alleged.[37] This is referred to as *Monell* liability.

70.    Municipalities can also be liable for acts of third parties where those officials "created the danger" that caused the harm.[38]

71.    The Tenth Circuit has reasoned that a sexual relationship between a teacher and student, even while the teacher is still a state actor, may be more like "private activity" for purposes of danger creation theory.[39]

72.    Accordingly, in this matter, the District is liable under § 1983 pursuant to either *Monell* liability, or the "state-created danger" theory, depending on whether Souli is considered to have been a "state actor" during the relevant time period.

a.       **Applicable Theories of Liability under *Monell***

73.    In *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S. Ct. 2018, 56 L.Ed. 2d 611 (1978), the Supreme Court held that municipalities can be liable under § 1983 for damages when

---

[35] *West,* 487 U.S. 42 at 49.
[36] *S.R. v. Hilldale Indep. Sch. Dist.* No. I-29, No. CIV-07-335-RAW, 2008 U.S. Dist. LEXIS 41591, at *14 (E.D. Okla. May 23, 2008)
[37]*Rall v. Hobbs Mun. Sch. Dist.*, No. CIV 15-0518 RB/CG, 2016 U.S. Dist. LEXIS 189223, at *22 (D.N.M. Mar. 16, 2016); *see also Monell v. Dep't of Soc. Servs. Of the City of N.Y.,* 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L.Ed. 2d 611 (1978)).
[38] *Marino v. Mayger*, 118 Fed. App'x. 393, 401 (10th Cir. 2004).
[39] See *J.M. ex rel. Morris*, 397 F. App'x at 458.

the municipality inflicts constitutional injury through a "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."[40]

74.     Such a policy or custom may include what is, in effect, a "policy of inaction" in the face of knowledge that municipal actors are routinely violating a specific constitutional right, thus becoming "the functional equivalent of a decision by the [municipality] itself to violate the Constitution."[41]

75.     Such *Monell* liability can be characterized in two ways in this matter: 1) "an informal custom[,]" that, while not expressly authorized, "is so permanent and well settled" it "constitute[s] a custom or usage with the force of law;"[42] and 2) a "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."[43]

76.     A plaintiff "cannot state a plausible claim of municipal liability by identifying a single incident of alleged violations and then, without further factual substantiation, contending that such actions were consistent with and caused by municipal policy, procedure, or failure to train." [44]

---

[40] *Id.* at 694.

[41] *Connick v. Thompson*, 563 U.S. 51, 61-62, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011) (internal quotation marks omitted); *see also Monell*, 436 U.S. at 690-91 (discussing § 1983's application to "customs and usages," not just formally adopted policies and practices)

[42] *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

[43] *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189-90 (10th Cir. 2010); *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010).

[44] *Salazar v. Castillo*, 2013 U.S. Dist. LEXIS 2000, 2013 WL 69154, at *6 (D. Colo. Jan. 7, 2013).

4883-3999-6888.v7

i.                    Informal custom

77.    Under the first "informal custom" theory, "[a] failure to investigate or reprimand [or otherwise appropriately respond] might also cause a future violation by sending a message to [district actors] that such behavior is tolerated."[45]

78.    "Public officials with notice of misbehavior by their subordinates must not take actions which communicate that they encourage or condone such behavior."[46]

79.    Such conduct as failing to discipline or failing to safeguard against a known danger establishes an unwritten policy or custom for purposes of section 1983.[47]

ii.                   Failure to train/supervise

80.    Under the second "failure to train" theory, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate [the municipality's] deliberate indifference for purposes of [a] failure to train [claim]."[48]

81.    The distinction between these two theories is significant because a failure to train theory requires proof of deliberate indifference, whereas a policy/custom theory does not.[49]

---

[45]*Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009)
[46] *Gates v. Unified Sch. Dist.* No. 449, 996 F.2d 1035, 1037 (10th Cir. 1993) (internal citations omitted).
[47] *Id.*
[48]*Trujillo v. City & Cty. of Denver*, Civil Action No. 16-cv-1747-WJM-MJW, 2017 U.S. Dist. LEXIS 57530, at *13 (D. Colo. Apr. 14, 2017), citing *Connick*, 563 U.S. at 62.
[49] *Connick v. Thompson*, 563 U.S. 51, 60-62, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011) (describing policy/custom claims generally and then moving to the more-specific theory of failure to train and noting its deliberate indifference requirement); *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) (approving the failure to train variant on *Monell* claims but announcing that the "degree of fault" required for such a claim is "deliberate indifference to the rights of persons with whom the police come into contact" (emphasis removed)); id. at 388 n.8 (addressing nuances of "[t]he 'deliberate indifference' standard we adopt for § 1983 'failure to train' claims"); *Bryson v. City of Oklahoma City*, 627

b.            **Liability Under the "State-Created Danger" Test**

82.      "Under the danger creation theory, state officials can be liable for the acts of third parties where those officials 'created the danger' that caused the harm."[50]

83.      This test is typically used when the abuser is found to not have been a state actor.

84.      To sustain a danger creation claim, Plaintiffs must show: (1) [d]efendants "created the danger or increased [the plaintiff's] vulnerability to the danger in some way;" (2) [the [plaintiff] "was a member of a limited and specifically definable group; (3) defendants' conduct put [the plaintiff] at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking."[51]

85.      A municipality can increase a plaintiff's vulnerability to the danger by "knowingly maintaining a custom or practice . . . [of neglecting requirements of] municipal policy and/or state statute.[52]

86.      A municipality may have "constructive notice that harm was substantially certain to result where there was a custom or practice of violating a policy. . .[in place] to ensure children's safety."[53]

---

F.3d 784, 788 (10th Cir. 2010) (listing five variants of *Monell* liability but only mentioning deliberate indifference in connection with the failure to train variant).
[50] *Marino v. Mayger*, 118 Fed. App'x. 393, 401 (10th Cir. 2004).
[51] *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1281 (10th Cir. 2003).
[52]*Rall v. Hobbs Mun. Sch. Dist.*, No. CIV 15-0518 RB/CG, 2016 U.S. Dist. LEXIS 189223, at *39 (D.N.M. Mar. 16, 2016) (Finding that a school district increased a student's vulnerability to the danger of sexual assault by knowingly maintaining a custom or practice where employees were not screened as required by municipal policy, the district had constructive notice that harm was substantially certain to occur where there was a practice of violating a policy for background checks, that such a practice constituted reckless disregard of the risk of unsafe adults, and that this behavior was "conscious-shocking").

4883-3999-6888.v7

87.     Acting in contravention to existing policy, or acting in deliberate indifference, in the face of a known risk may be "conscience shocking."[54]

## FACTUAL ALLEGATIONS

88.     Davis School District has a history of failing to protect the privacy of its students.[55]

89.     Davis School District also has a history of employed educators inappropriately communicating with students via texting, social media, and grooming students using their status as teachers and staff members.[56]

90.     Davis School District hired Souli to work as a soccer coach without taking steps to ensure that he was safe to work around underage girls and students, in part due to his reputation as a coach.

91.     Souli has a reputation as a "magic" coach who can turn troubled teams around, place favored athletes at elite colleges, and obtain lucrative scholarships.

92.     Unsurprisingly, players and their parents are eager to be in his good graces, hoping some of the largesse will fall upon them.

93.     Souli is aware of his reputation and used it to solicit gifts and other items from players' families in exchange for playing time and favorable treatment. On information and belief, in exchange for staying in his good graces, Souli normalized the practice of families

---

[53] *Id.*
[54] *Id.*
[55]    https://www.ksl.com/article/50719384/davis-school-psychologist-admits-sharing-info-about-student-her-husband-later-raped
[56]    https://kutv.com/newsletter-daily/judge-dismisses-lawsuit-against-davis-school-district-after-teachers-sex-abuse-conviction

paying him for private coaching, accepted vacations to Europe and Disneyland and tickets to sporting events, and established an expectation of gifts for his birthday.

94.     Parents have also given up guardianship of their daughters to family or friends who live within the DHS boundary, in order to get a place on Souli's teams.

95.     This reputation, and his reputation for naming and shaming students who displease him, have created a cult-like core of supporters who ignore or refuse to believe any negative reports about Souli.

96.     DHS and the District allowed and encouraged this cult of adulation, which contributed substantially to the harmful actions and inactions described below.

97.     On information and belief, the District did not conduct a nationwide criminal background check and did not conduct ongoing monitoring of Souli.

98.     On information and belief, shortly after beginning to work at the District, Souli was advised by the District to stop having his female students sit in his lap.

99.     Nevertheless, the District did not properly supervise him while he was allowed to teach and associate with students, including Plaintiffs.

100.     Souli was in a position of special trust over his students, including Plaintiffs, as a coach and educator at Davis High School during the relevant time period.

101.     The District did not arrange appropriate supervision during soccer practice time, instead allowing Couch Souli to interact with students alone and/or accompanied only by his handpicked assistants.

102.     At Souli's request, the District arranged time for him to be alone with underage female students, including Plaintiffs, by organizing an off-season class period and approving

school credit for enrollees, which gave Souli additional improperly supervised access to these young vulnerable students.

103.    On information and belief, Souli would conduct and be paid for separate private coaching sessions that overlapped with this scheduled class.

104.    JANE DOE 1, JANE DOE 2, JANE DOE 3, JANE DOE 4, JANE DOE 5, and JANE DOE 6 were enrolled in this class and/or participated on the girls' soccer team coached by Souli.

105.    On information and belief, the boys' practice time and class experience was not equivalent to the girls' practice time and class experience as to the nature of activities not directly related to soccer.

106.    Souli also regularly rescheduled soccer practice times or did not disclose them until the night before or the morning of the practice, making it more difficult for parents and guardians to attend in an apparent effort to secure more unsupervised time with the girls' soccer team players.

107.    During his employment at Davis School District, including in soccer practice and soccer class, Souli began to engage in grooming behaviors around and with underage girls, including Plaintiffs, during and outside school hours, on and off school property.

108.    For example, Souli encouraged the girls on his soccer teams and/or in his class to make videos together for him to view.

109.    Some of these videos copied or adapted famous music videos.

110.    One of these videos was an adaptation, featuring DHS girls' soccer team members and students in Souli's class, of the music video for "Wrecking Ball" by Miley Cyrus. The

original music video attracted significant criticism for its hypersexualized imagery, including Miley Cyrus simulating oral sex on a hammer, dressed initially in a midriff-baring tank top, panties, and boots, and later shown only wearing the boots. On information and belief, in the adaptation made for Souli at his request, underage girls recreated these scenes by wearing skin-colored swimsuits or bodysuits or other revealing attire inappropriate for a school setting.

111.    On information and belief, Souli retained a copy of this adaptation in his private files and showed it to successive years of girls' soccer team members and girls' soccer class students, including Plaintiffs, as an example of the quality and content they should strive for in their own videos made at his behest.

112.    Souli described this adaptation as the "best" video his students and/or teams had put together for him, and challenged his later teams and students to out-do it.

113.    Souli set aside class time on Fridays for the girls' soccer class students to make these videos for him. He referred to those days as "Fun Fridays."

114.    Some Fun Fridays were themed. For example, because Souli was a fan of Taylor Swift, one of the themes was Taylor Swift. On that occasion, he had girls dress up as Taylor Swift, including some in bikinis, on school grounds during school hours. Eventually, an assistant principal had to intervene to tell the girls to put on additional clothing.

115.    On information and belief, Souli organized and attended girls' team swim parties at which he judged dancing competitions until a District employee instructed Souli to stop attending such parties.

116.    On information and belief, after he stopped attending these parties in person, Souli and/or others pressured the girls to put together a videos of swimsuit dancing competitions and submit them to Souli.

117.    Souli also had the girls' soccer team members perform dances for him to judge at team retreats, including "twerking."

118.    Souli also regularly engaged in inappropriate conversations with the girls on his soccer teams and/or in his class.

119.    For example, during a club team trip for an away game, members of the girls' team stayed at a hotel overnight. Souli came to the girls of the club team to discuss their performance and goals. He also told them a story of accomplishing his dream to motivate the girls to accomplish their dreams. Souli told the girls, including JANE DOE 2, that it had been his dream to be a stripper, and that he had been at a bachelorette party in a hotel setting similar to the one the team was staying in. Souli told the girls that he had been wearing "tear away" pants on that occasion, and when he ripped the pants off as part of his stripper act, his underwear had also come off at the same time, exposing his penis. He gave additional details regarding girls touching his "junk."

120.    On other occasions, Souli would monitor how much certain girls ate during team retreats or team trips and would comment critically on how the amount of food would affect the way they looked.

121.    He did not comment on how the amount of food they ate might affect their ability to play soccer.

122.    Souli discussed the girls' uniforms with them, including whether the tank tops would make the girls' breasts more noticeable.

123.    As punishment for not being present when uniforms were passed out, JANE DOE 6 was given a size 0 pair of soccer shorts, despite requesting a size 4/6.

124.    On several occasions, Souli would publicly shame JANE DOE 6 by making sexual comments about her "ass hanging out."

125.    Souli discussed other aspects of the girls' uniforms with them, including, such as whether sweat would show on their grey shorts, which he referred to as showing "swass"—short for "sweaty ass."

126.    In fact, Souli occasionally instructed the girls, including JANE DOE 2, to "bend over" and "let me see if you have swass."

127.    Souli kept tabs on who was dating whom and discussed the girls' dating lives in inappropriate and invasive ways.

128.    One method he employed was to create accounts on youth-oriented social media apps to communicate with underage students and soccer team members.

129.    For example, Souli created accounts on VSCO, Instagram, and BeReal and used them to follow the social lives of the teenage students and soccer team members, including JANE DOE 3 one or more of Plaintiffs.

130.    Souli also employed one-on-one text messaging with certain girls to exchange pictures and flirtatious messages.

22

131.   Souli wanted to know who the girls had crushes on, who they had kissed, who they had gone further with, etc. Souli's demands for information came both orally and by text message.

132.   On one occasion, he approached JANE DOE 2 demanding to know why her boyfriend had removed another girl from his Snapchat friends. JANE DOE 2 was eventually extricated from the uncomfortable discussion by another teacher.

133.   On another occasion, he asked JANE DOE 3 whether she had "gotten down" with a particular boy over the summer.

134.   Souli would ask other girls, including JANE DOE 2 and JANE DOE 3 who they had kissed, who they were making out with, and who they were "getting down with."

135.   After a homecoming event, Souli had the girls sit in a circle and each had to share who they had kissed and how they had come to kiss that person. Although the girls initially refused, Souli eventually pressured them into sharing that intimate information.

136.   Souli decorated his classroom with sexually suggestive signs, such as one that stated "You Belong with Me, Let's Spoon," "Spooning Leads to Forking: So Use Condiments," and "Spoon Don't Fork." He also regularly wore clothing to school events and team activities that bore the message "Spoon Don't Fork" message.

137.   Spooning is a form of cuddling in which one person embraces another from behind so both are facing the same direction. In this context, forking is an obvious pun for "fucking."

138.   Other signs in his classroom continued this theme, stating "You belong with me, let's spoon."

139.    In text messages Souli exchanged with girls he continued to use the spoon and fork references.

140.    During class time, Souli would normalize sexually charged conversations, including discussing with his students certain "hot moms," "MILFs," and "thirst traps."

141.    MILF is a shorthand term meaning "mother I'd like to fuck" and "thirst traps" are pictures and videos posted on social media that entice viewers sexually.

142.    Souli claimed that his number one rule of coaching was not to touch the players.

143.    Nevertheless, JANE DOE 2 and JANE DOE 3 observed him braiding girls' hair during a soccer game or practice.

144.    Souli admitted doing so.

145.    Souli's statements and behaviors discouraged students from pursuing certain educational programs or activities, including participating in the soccer team or enrolling in the soccer class, effectively denying those students equal access to the District's educational programs and activities.

146.    Participation in sexually charged conversations and activities and exposure to Souli's grooming behaviors effectively became a condition of participating in girls' soccer classes and teams at Davis High School. In other words, a student had to engage in these conversations and be exposed to these behaviors if that student wanted to receive the educational, sports, and scholarship opportunities associated with playing girls' soccer at Davis High School.

4883-3999-6888.v7

147.    On information and belief, the boys' soccer students there were not required to engage in similar sexually charged conversations and activities during mandatory soccer practice and class time.

148.    Souli also told parents at parent meetings that they could not complain about him because it was just his coaching style. He told parents that he had the school administration wrapped around his finger, and that anyone who came forward to the administration would be ignored because they and their parents would be seen as bitter because they were not getting enough playing time.

149.    In fact, when Plaintiffs raised concerns with the District's administrators, they were generally ignored.

150.    Eventually, after repeated and prolonged efforts by Plaintiffs' parents and others to engage the District regarding Souli's inappropriate behavior and access, the District agreed to listen to Plaintiffs' complaints, promising that their identities would be protected (in line with the District's legal obligations to protect their identities).

151.    In or about September 2023, a parent of one of the Plaintiffs met with a DHS assistant principal (Doug Peterson) and athletic director to present evidence of some of the misconduct described above.

152.    After three weeks of inaction by DHS and the District, another parent raised similar concerns to DHS administrators.

153.    Despite the lack of any response to the parents, the daughters of the complaining parents were both given significantly more varsity playing time in the next soccer games.

4883-3999-6888.v7

154.    On information and belief, Souli, DHS administrators, and the District generally viewed all complaints from parents to be motivated by a lack of playing time.

155.    On information and belief, this view resulted in a culture of inaction, wherein Souli, DHS administrators, and the District attempted to resolve complaints by giving the complainants more playing time for a few games without addressing the gravamen of the complaints.

156.    On information and belief, DHS administrators and/or the District informed Souli about the parents' complaints and unlawfully disclosed the identities of the parents and/or students.

157.    They did so to enable Souli to give the aggrieved students more playing time in an attempt to appease them in the customary manner described above.

158.    DHS and the District thereby failed to protect Plaintiffs' identities.

159.    The parents of the two students, plus two other sets of parents, requested a follow-up meeting with Principal Hawthorne, requesting that Assistant Principal Peterson not attend due to the lack of confidentiality.

160.    Principal Hawthorne refused the request to exclude Mr. Peterson from the meeting.

161.    Shortly thereafter, and despite the announced concerns regarding Mr. Peterson's ability to maintain confidentiality, Principal Hawthorne assigned Mr. Peterson to assist with the investigation, and Mr. Peterson began reaching out to parents to schedule interviews with the parents' daughters.

162.    Almost immediately, one of the Plaintiffs was accosted by a player from the boys'
soccer team who accused her of being one of four girls making complaints about Souli.

163.    The accosting player was aware of details regarding the complaints that should
have been known only to the DHS administrators, the complaining students, and their parents.

164.    The DHS administration announced that the investigation would only look into
events for the current school year, which had only just begun.

165.    The parents raised their concerns about the lack of confidentiality to another
District administrator, Chadli Bodily, who met with them on October 10, 2023.

166.    Ms. Bodily advised the parents that their daughters should quit the soccer team
rather than wait for the District to act. She further advised them to drop the complaints if the
students wished to continue participating in soccer activities and classes. Ms. Bodily also
mocked and belittled the parents, making clear her disdain for their concerns.

167.    On October 11, 2023, less than a day after receiving written statements from
players and parents, Principal Hawthorne announced that the investigation was complete.

168.    On the same day, Souli did not attend practice. He also did not attend a soccer
game on October 12, 2023.

169.    The game was coached by Souli's assistant. During the game, JANE DOE 2 was
not given playing time, despite having played the entire second half of the previous game and
being praised by the assistant for her performance.

170.    When JANE DOE 2 inquired why she had not gotten to play, the assistant said it
was "too emotional" and that she couldn't tell JANE DOE 2 why she was not allowed to play.

171.    By October 25, 2023, Souli had returned to the classroom.

27

172.    Rumors, including specific details from the supposedly confidential interviews and statements, emerged among the students. Several members of the girls' and boys' soccer teams began bullying, threatening, and targeting the victims that had reported the misconduct.

173.    On information and belief, DHS administrators and/or the District unlawfully leaked information about the investigation into Souli, including the identities of the victims and details of their accusations.

174.    On October 31, 2023, Souli resigned as the DHS soccer coach.

175.    On November 1, 2023, Principal Hawthorne met with some of the parents who still supported Souli. At the meeting, which was recorded, Principal Hawthorne downplayed some of the complaints, omitted others, and expressed concern for Souli and the hardship supposedly worked upon him.

176.    This selective presentation and expression of support fueled further anger against the victims who had complained and whose identities had been exposed.

177.    The parents of the victimized students met with another District official, Superintendent Dan Linford.

178.    Mr. Linford indicated that the reported behaviors (inappropriate touching, sexual misconduct, improper and unsupervised coach-to-minor communications, etc.) were not concerning to him or to the District.

179.    Mr. Linford also discounted the complaints about the lack of confidentiality.

180.    Mr. Linford's son played on Souli's club soccer team.

181.    Mr. Linford failed to disclose that his son was on Souli's club soccer team.

182.    Souli gave Mr. Linford's son extensive playing time and justified doing so by referencing that the player was his "boss's son."

183.    Mr. Linford failed to disclose that his son received this preferential treatment.

184.    On November 2, 2023, several players with the apparent support of Principal Hawthorne initiated a "Free Souli" campaign. Part of the campaign involved wearing red to show support and wearing distinctive bracelets or armbands so that they would know anyone without a bracelet or armband was "part of the problem."

185.    Principal Hawthorne advised the victims to lie about their involvement in reporting and to pretend to support Souli to avoid detection.

186.    Despite repeated reports and numerous opportunities, the DHS administration and the District failed to take steps to protect victims, maintain confidentiality, or defuse the situation.

187.    In fact, S.P., one of the students who participated in bullying the victims, is the daughter of a substitute teacher who works at DHS. That substitute teacher, whose daughter had a history of favorable treatment by Souli, discussed the complaints with other students and characterized the victims' complaints as "stupid" and false, causing the other students to perpetuate the bullying.

188.    After the substitute teacher was reported for such behavior, and despite being informed of the student's discomfort at having the substitute teacher in class, Principal Hawthorne did not suspend the substitute teacher or take other steps to protect the student.

189.    On or about November 12, 2023, Principal Hawthorne confirmed that the new soccer coach was considering hiring Souli as an assistant coach.

29

190.    The announcement was interpreted as a vindication of Souli, reigniting the bullying against the victims.

191.    At a school-sponsored team meeting on District grounds on October 30, 2023, players who supported Souli, including S.P., attempted to physically intimidate Plaintiffs by leaning over desks, getting directly in their faces, and threatening them.

192.    One of the players pointed to every Plaintiff present, stating that they "should all be scared."

193.    At school events and on school premises, including during instructional time, at dances, at team tryouts, and at sports games, other students who had become aware of Plaintiffs' identities due to the District's actions physically retaliated against Plaintiffs, including hitting and kicking them.

194.    For example, at a school dance on March 9, 2024, two girls' soccer team members (S.P. and C.P.), who had vocally supported Souli, physically assaulted and injured JANE DOE 3 for reporting Souli's misbehavior to the District.

195.    Plaintiffs reported these incidents but the District failed to neutrally and properly investigate the same.

196.    In fact, in a March 13, 2024 email, Principal Hawthorne responded to the complaint by asserting that JANE DOE 3 should have predicted the assault and proactively contacted the school *before* the dance to warn school administrators.

197.    Principal Hawthorne also suggested that JANE DOE 3 was at fault for not finding an administrator at the dance to watch over JANE DOE 3; "At dances, we are all very easy to find in our audacious gold sequined jackets."

198.    Principal Hawthorne did not express concern that the "audacious gold sequined jackets" would make it easier for students with nefarious intentions to identify administrators and avoid their supervision when carrying out the assaults.

199.    With respect to the school dance example, a District employee misstated the reporting process and did not tell JANE DOE 3 to file an incident report or even that there was an opportunity to do so.

200.    During this period of inaction by the District, another school dance was held.

201.    At the subsequent dance on April 27, 2024, the same two girls' soccer team members (S.P. and C.P.) physically assaulted and injured JANE DOE 2 for the same reason, i.e., for reporting Souli's misbehavior to the District.

202.    On information and belief, video camera footage existed of some of these incidents but was intentionally or negligently lost or misplaced by the District or was otherwise withheld from Plaintiffs.

203.    During its investigation, the District refused to interview certain eyewitnesses to the physical violence.

204.    The District's stated rationale was that the District believed these eyewitnesses knew or associated with Plaintiffs..

205.    Nevertheless, the District interviewed the students alleged to have hit Plaintiffs and, based on their denials, declined to take any disciplinary action or to protect Plaintiffs from the situation its administrators had placed them in.

206.    Instead, the District's response was limited to suggesting ways for Plaintiffs to hide from or avoid Souli's supporters.

207.    In fact, the two girls' soccer team members who committed these assaults were rewarded with "team captain" status by Souli's former assistant and replacement as coach, a District employee.

208.    Unusually, the team captains were selected by the District before tryouts and, in the words of Principal Hawthorne, without "provid[ing] an opportunity for all veteran senior team members to highlight their leadership abilities throughout pre-season conditioning."

209.    During soccer team tryouts and events, including on July 16, 2024, and July 30, 2024, one of the two newly-minted team captains continued her pattern of violence by assaulting JANE DOE 6.

210.    The assaults took place in front of District employees and were reported to the District by the victims.

211.    DHS and the District knowingly or negligently allowed these bullying behaviors and physical assaults to continue, thereby failing to protect the victims from further harm.

212.    The attacks continued.

213.    The new coach attempted to apologize for the team captain's attacks and stated that the attacks were out-of-line and completely inappropriate.

214.    Notably, the assaults were enabled and caused by DHS and the District's failure to maintain reporting confidentiality.

215.    On information and belief, the District and/or its employees continued to tell other parents and students that Plaintiffs had complained about Souli because they had not been given enough playing time.

216.    On information and belief, Mr. Peterson offered to tell coaches and/or trainers which Plaintiffs were "troublemakers."

217.    All of the players who had complained about Souli or reported his misbehaviors were cut from the team after tryouts.

218.    Other girls, who had not even participated in the tryouts, were given their places on the team.

219.    The District engaged in a pattern of ignoring or downplaying Plaintiffs' reports of physical violence against them.

220.    The District took little to no action to protect Plaintiffs from the reported physical violence.

221.    The District's intentional or negligent inaction allowed the physical violence against Plaintiffs to continue.

222.    Worse, the combination of the District's cursory investigation and its subsequent failure to take adequate measures to stop the physical violence intentionally or negligently conveyed the message that the District would tolerate continued acts of physical violence against Plaintiffs.

223.    In fact, the District rewarded the perpetrators of the violence with team captain positions.

224.    By cutting Plaintiffs' playing time or removing them from the team for complaining about Souli's grooming behaviors, the District effectively required acquiescence to that behavior as a condition of participation in girls' soccer at Davis High School.

225.    In addition to the obvious emotional trauma of being betrayed by their coach and by the District, and the physical trauma of being assaulted and battered due to the District's failure to protect their identities, Plaintiffs' educational and sports-related aspirations have been damaged by the District's acts and omissions.

## FIRST CLAIM
### (Violations of Title IX)

226.    Plaintiffs incorporate and reallege all allegations of the Complaint as if fully set forth herein.

227.    Sexual grooming, in and of itself, is an extremely damaging and traumatic experience for children that can have lasting effects. Plaintiffs, and others, were thoroughly exposed to sexual grooming by Souli and suffered harm as a direct result of it.

228.    The principal of Davis High School and administrators of the District were certainly authorized decision-makers under Title IX and had the obligation to ensure the safety of their students.

229.    The principal and administrators were aware of the complaints lodged by parents, including Plaintiffs' parents, about Couch Souli's behavior towards and around underage female students, including building relationships of dependence, acquiring personal information about dating activities, normalizing sexually oriented conversations and activities, and isolation.

230.    Even after repeated reports from parents, including Plaintiffs' parents, the principal and administrators failed to take any reasonable action or investigation into Souli's private fiefdom of soccer teams and classes.

231.    The principal and administrators, and the District, were deliberately indifferent when, having received multiple reports regarding Souli's grooming behaviors, they failed to act

34

4883-3999-6888.v7

to ensure this harmful sexual grooming stopped. Souli was able to freely continue sexually grooming students and soccer players, including Plaintiffs.

232.    The District could have, but did not, take reasonable steps to limit, monitor, or prevent Souli's access to students in his private classes, in team activities such as team retreats, trips, or games, or on social media.

233.    The District could have, but did not, take reasonable steps to limit, monitor, or prevent Souli from communicating inappropriately with students, including by text messages and/or other messaging apps.

234.    The District could have, but upon information and belief did not, hire a third-party to investigate parental complaints against Souli, require that Souli be supervised during team activities or his class, or require proof or verification that Souli was not communicating with underage soccer team members or students via text message or other social media apps.

235.    The District's indifference and inaction, despite its actual knowledge of the grooming behavior, took no steps to prevent further harmful sexual grooming of Plaintiffs or other girls.

236.    The District knew or should have known of the physical violence directed by others against Plaintiffs.

237.    The District knew or should have known that the physical violence was motivated by the District's improper disclosure of Plaintiffs identities.

238.    The District could have, but upon information and belief did not, taken reasonable steps to protect Plaintiffs from the retaliatory physical violence.

239.    The District's failure to take the aforementioned reasonable steps was due to its deliberate indifference and inaction.

240.    As a result of the District's deliberate indifference and inaction, Plaintiffs suffered harm including emotional injury, pain and suffering, past and future expenses for counseling and therapy, and other special damages known and unknown to Plaintiffs at this time.

## SECOND CLAIM
### (Violations of § 1983)

241.    Plaintiffs incorporate and reallege all allegations of the Complaint as if fully set forth herein.

242.    Plaintiffs had and have constitutional rights to bodily integrity and safety.

243.    Souli, the principal, and the District administrators were state actors under § 1983.

244.    The District had an informal policy and custom of failing to enforce, (or "a policy of inaction" regarding) its own policies about student supervision and taking action to protect students against known conditions detrimental to their health, safety, and learning, illustrated by the pattern of teachers caught for grooming and sexually abusing students, the pattern of ignoring reports by students and their parents, and the pattern of failing to properly investigate reports of physical retaliation against reporting students.

245.    Despite the District's knowledge that previous teachers had routinely violated students' constitutional rights to bodily integrity and safety through the specific methods of inappropriate communication and inappropriate behavior, the District maintained its policy of inaction to the same.

4883-3999-6888.v7

246.    Despite the District's knowledge that previous administrators had routinely violated students' constitutional rights to bodily integrity and safety by releasing information and reports from vulnerable students, the District maintained its policy of inaction to the same.

247.    The District had an informal policy and custom of failing to protect students who complained about certain teachers and employees from retaliation by other students.

248.    Despite the District's knowledge that students routinely retaliated against such "whistleblowers," the District maintained its policy of inaction to the same.

249.    As a result of the District's "policy of inaction," Plaintiffs suffered harm including emotional injury, pain and suffering, past and future expenses for counseling and therapy, and other special damages known and unknown to Plaintiffs at this time.

250.    The District was responsible for a pattern of similar constitutional violations by untrained/unsupervised employees against students' right to bodily integrity and safety, illustrated by the earlier teachers who were discovered grooming students by similar means.

251.    The District had an informal policy and custom of failing to enforce, (or "a policy of inaction" regarding) its own policies about student supervision and taking action to protect students against known conditions detrimental to their health, safety, and learning, illustrated by the pattern of teachers caught for grooming and sexually abusing students, the pattern of ignoring reports by students and their parents, the pattern of failing to properly investigate reports of retaliatory physical violence against reporting students, and the pattern of allowing such violence to continue.

252.    Despite the District's knowledge that previous teachers had routinely violated students' constitutional rights to bodily integrity and safety through the specific methods of

inappropriate communication and inappropriate behavior, the District maintained its policy of inaction to the same.

253.   Despite the District's knowledge that previous administrators had routinely violated students' constitutional rights to bodily integrity and safety by releasing information and reports from vulnerable students, the District maintained its policy of inaction to the same.

254.   Despite a pattern of similar constitutional violations, the District failed to implement effective training and supervision practices of its teachers.

255.   Despite a pattern of similar constitutional violations, the District failed to implement any training of students regarding what constitutes sexual grooming and to whom to turn if they believe a teacher may be sexually grooming them.

256.   Despite the District's knowledge that it had not taken adequate action to end the retaliatory physical violence which violated students' constitutional rights to bodily integrity and safety, the District failed to implement effective training and supervision of its employees and administrators.

257.   These inactions by the District demonstrate "deliberate indifference" for purposes of a failure to train claim under § 1983.

258.   As a result of the District's "policy of inaction," Plaintiffs suffered harm including emotional injury, pain and suffering, past and future expenses for counseling and therapy, and other special damages known and unknown to Plaintiffs at this time.

259.   If Souli, the principal, and/or the District administrators are found to not have been state actors at any point, the District is liable under the "created danger" theory pursuant to § 1983.

260.    The District created the danger or increased Plaintiffs' vulnerability to the danger by ignoring and failing to enforce its own policies regarding student supervision and taking action to protect students against known conditions detrimental to their health, safety, and learning.

261.    The District increased Plaintiffs' vulnerability to the danger by its deliberate indifference to the reports made against Souli by parents including Plaintiffs' parents.

262.    The District increased Plaintiffs' vulnerability to the danger by allowing Souli unsupervised interactions with underage students in his soccer teams and private class, even after the reports made against him by parents including Plaintiffs' parents.

263.    Plaintiffs were a member of a limited and specifically definable group: a female students and soccer players at Davis High School.

264.    The District's conduct put Plaintiffs at substantial risk of serious, immediate, and proximate harm; including by being sexually groomed by Souli and assaulted by other students whom the District had made aware of their complaints against Souli.

265.    The risk posed by Souli was obvious and known; not only does the District have a known pattern of teachers engaged in grooming behaviors, but the District was on specific notice of Souli's inappropriate contact with Plaintiffs and other students.

266.    The risk posed by other students was obvious and known; the District had been informed of the same repeatedly by Plaintiffs and others.

267.    The District acted recklessly in conscious disregard of that risk, illustrated by its failure to enforce its existing policies, failure to implement effective policies, and deliberate indifference to its actual notice of Souli's behavior, actual notice of the results of its own acts of

39

leaking Plaintiffs' identities, and actual notice of the retaliatory physical violence against Plaintiffs.

268.    The District's conduct, in total, shocks the conscience.

269.    As a result of this state-created danger, Plaintiffs suffered harm including emotional injury, pain and suffering, past and future expenses for counseling and therapy, and other special damages known and unknown to Plaintiffs at this time.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment against Defendant as follows:

270.    For judgment in Plaintiffs' favor and against the District for violations of Title IX;

271.    For judgment in Plaintiffs' favor and against the District for its multiple forms of liability under § 1983;

272.    For an award of compensatory damages, including economic and non-economic damages, in favor of Plaintiffs and against Defendant, including damages resulting from emotional distress, in an amount in excess of $10,000,000 to be determined at trial;

273.    For an award of reasonable attorneys' fees and costs associated with this action;

274.    For an award of post-judgment interest as allowed by law;

275.    For such other and further relief as the Court may deem just.

## JURY DEMAND

276.    Plaintiffs demand a trial by jury on all causes of action.

DATED this 12th day of January, 2026.

PARSONS BEHLE & LATIMER

/s/ *Michael W. Young*

Michael W. Young
Adam Bondy

*Attorneys for Plaintiffs*

41